UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ROWE ENTERTAINMENT, et al.

                Plaintiffs,

        - against -

THE WILLIAM MORRIS AGENCY INC.,
et al.

                Defendants.
----------------------------------------------------------X

98 CV 8272 (RPP)

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On March 2, 2012, Leonard Rowe (hereinafter "Mr. Rowe"), proceeding pro se, moved pursuant to Rule 60 of the Federal Rules of Civil Procedure for relief from a February 7, 2005 judgment of this Court, Rowe Entm't, Inc., et al. v. William Morris Agency, Inc., et al., No. 98 CV 8272, 2005 WL 22833, at *87 (S.D.N.Y. Jan. 5, 2005), which has been affirmed on appeal, 167 F. App'x 227 (2d Cir. 2005), cert. denied, 549 U.S. 887 (2006).  More than seven years after this Court entered judgment against him, Mr. Rowe seeks to reopen the case based on his claim that his former attorneys conspired with attorneys for Defendants William Morris Agency ("WMA"), Creative Artists Agency ("CAA"), and Renaissance Entertainment Inc. ("Renaissance") (collectively "the Booking Agency Defendants") to conceal and destroy vital evidence.  Mr. Rowe alleges that e-mails of the employees of the Booking Agency Defendants "contained the word 'nigger' nearly 400 times," along with other racial slurs.  (Aff. of Leonard Rowe in Supp. of Mot. ("Rowe Aff.") ¶¶ 5, 9, 11-12, Mar. 2, 2012.)  Mr. Rowe claims that these e-mails "clearly demonstrated the racial animus of these defendants as it related to their contractual dealings with [P]laintiffs," but that his former attorneys conspired with Defendants to

1

hide the evidence, thus committing fraud upon the Court.  (Id. ¶ 5.)  Mr. Rowe relies upon a single document ("Exhibit A") to support his motion.[1]

Mr. Rowe's claim is meritless.  First, although Rule 60(b)(2) of the Federal Rules of Civil Procedure allows the Court to reopen a case if the Court is presented with "newly discovered evidence," Exhibit A is by no means "newly discovered."  Exhibit A is the same document that Plaintiffs submitted as Exhibit 31 in 2003 and 2004.[2]  At that time, Plaintiffs, represented by the Florida law firm of Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando (the "Gary Firm"),[3] filed the document in opposition to Defendants' motion for summary judgment.  See Rowe, 2005 WL 22833, at *87.  Therefore, Exhibit A/Exhibit 31 is not "newly discovered," and Mr. Rowe is not entitled to relief under Rule 60(b)(2).  Moreover, Mr. Rowe filed his motion seven years after the entry of judgment.  Even if he had provided "newly discovered evidence," his motion would be time-barred by the one year statute of limitations stated in Rule 60(c)(1) of the Federal Rules of Civil Procedure.

Nor has Mr. Rowe shown that he is entitled to reopen his case under Rules 60(b)(3), 60(b)(6), or 60(d)(3), the other three provisions of Rule 60 that might be applicable to his allegations.  Rule 60(b)(3) allows the Court to grant relief from a judgment if the movant

---

[1] Mr. Rowe initially submitted no evidence in support of his motion other than a memorandum of law and his own affirmation.  Subsequently, in response to declarations filed by his former attorneys, Mr. Rowe submitted Exhibit A, which is discussed in more detail infra at 4-5, as well as a one-page excerpt from Plaintiffs' summary judgment opposition brief, a document purporting to be a summary of settlement disbursements in the underlying action, selected bills from his attorneys, and three articles concerning a former employee's allegations of corruption within the New York Appellate Division, First Department's disciplinary committee.  Of these submissions, only Exhibit A relates to Mr. Rowe's claim that Defendants acted with racial animus.

[2] The parties' correspondence shows that Plaintiffs sent Exhibit 31 to Defendants on some date between April 2, 2003 and May 1, 2003.  (See Decl. of Beverley R. Frank in Supp. of the Booking Agency Defs.' Mots. for Sum. J., ("Frank Decl."), Ex. A ¶¶ 36-40, May 23, 2003; id., Ex. O.)  Plaintiffs did not file Exhibit 31 with the Court, however, until July 23, 2004.  (See Pls.' Joint Mem. in Opp. to the Booking Agency Defs.' Mot. for Summ. J. ("Pls.' Joint Mem."), Ex. 31; see also ECF Nos. 605-671.)

[3] As of March 28, 2003, Plaintiffs were no longer represented by the attorneys Mr. Rowe complains about in his current Rule 60 motion.  Instead, Plaintiffs were represented by the Gary Firm.  (See discussion infra at 7-8.)

demonstrates by "clear and convincing evidence" that the <u>opposing party</u> engaged in misconduct. Fed. R. Civ. P. 60(b)(3) (emphasis added); <u>see also</u> <u>Schiel v. Stop & Shop Co., Inc.</u>, No. 96 CV 1742, 2006 WL 2792885, at *6 (D. Conn. Sept. 6, 2006).  Mr. Rowe has presented no evidence, let alone clear and convincing evidence, that Defendants or opposing counsel engaged in any misconduct.  Furthermore, motions pursuant to Rule 60(b)(3) must be filed within one year of the date of judgment.  Fed. R. Civ. P. 60(c)(1).

Rule 60(b)(6) allows the Court to reopen a case "for any other reason that justifies relief" provided that the Plaintiff demonstrates "extraordinary circumstances or extreme and undue hardship."  <u>Dow Jones & Co., Inc. v. WSJ Inc.</u>, No. 97 CV 7690, 1998 WL 2370, at *2 (2d Cir. 1998) (internal citation omitted); Fed R. Civ. P. 60(b)(6).  Mr. Rowe's motion, however, has failed to set forth either extraordinary circumstances or extreme and undue hardship.  Moreover, Rule 60(b)(6) claims must be filed "within a reasonable time" after the entry of judgment, as stated in Federal Rule of Civil Procedure 60(c)(1).  In this Circuit, a reasonable time is within eighteen months of the entry of judgment, <u>Maisonet v. Conway</u>, No. 04 CV 2860, 2011 WL 317833, at *3 (E.D.N.Y. Jan. 31, 2011) (listing cases), unless the movant shows good cause for the delay or mitigating circumstances, <u>Korelis v. Pennsylvania Hotel</u>, No. 99 CV 7135, 1999 WL 980954, at * 1 (2d Cir. Oct. 8, 1999) (internal citation omitted).  Despite having filed his motion seven years after the entry of judgment, Mr. Rowe's motion has neither set forth good cause for his delay nor any mitigating circumstances

Rule 60(d)(3) authorizes the Court to reopen a case if the movant provides "clear and convincing evidence" that fraud on the Court has been committed.  Fed. R. Civ. P. 60(d)(3); <u>see</u> <u>Madonna v. United States</u>, 878 F.2d 62, 65 (2d Cir. 1989); <u>Passlogix, Inc. v. 2FA Tech., LLC</u>, 708 F. Supp. 2d 378, 396 (S.D.N.Y. 2010).  Under Rule 60(d)(3), claims against a party's own

3

counsel for fraud on the court are not subject to a statute of limitations.[4]  See Fed. R. Civ. P. 60(d)(3).  Mr. Rowe, however, has not provided any evidence that his own former attorneys, or anyone else, committed any fraud on the court, despite the fact that for the past seven years Mr. Rowe has had the clear opportunity to determine if any such fraud occurred.

In support of his present motion, Mr. Rowe relies on Exhibit 31/Exhibit A.  Although Mr. Rowe promotes this document as a clear demonstration of Defendants' racial animus and irrefutable proof that a conspiracy existed between his former attorneys and Defendants' counsel, (see Rowe Aff. ¶ 5), Exhibit 31/Exhibit A is not the "smoking gun" that he portrays it to be. Exhibit 31/Exhibit A is "an unidentified and unauthenticated document," that was "not produced by Plaintiffs in discovery."  Rowe, 2005 WL 22833 at *53 n.143.  The document contains three columns, one with names, the next with words that could or could not be used in contexts indicating racial animus,[5] and the third with numbers.[6]  The document, which apparently is a printout listing the number of times certain racially inflammatory words appeared in the e-mail accounts of certain employees of Defendants, does not distinguish between whether these words

---

[4] A movant whose allegations properly fall under Rule 60(b)(3) but who inexcusably fails to file a timely claim for relief within Rule 60(b)(3)'s one year statute of limitations may not salvage the claim by filing under Rule 60(d)(3) instead.  See Anderson v. New York, No. 07 CV 9599, 2012 WL 4513410, at *4 (S.D.N.Y. Oct. 2, 2012). Here, Mr. Rowe's claims against Defendants' counsel would properly fall under Rule 60(b)(3).  See LinkCo, Inc. v. Akikusa, 615 F. Supp. 2d 130, 139 (S.D.N.Y. 2009).  Accordingly, Mr. Rowe's claim that Defendants counsel committed fraud upon the Court is time-barred.  Rule 60(b)(3) does not apply to Mr. Rowe's claims against his former attorneys, however, and thus his Rule 60(d)(3) claim against them is not barred by the statute of limitations.

[5] While Exhibit 31/Exhibit A features references to clear racial slurs like "nigger," and "negro," it must be kept in mind that the Booking Agency Defendants represent rap and hip-hop artists whose songs often feature lyrics that contain racial language.  In addition to these racially loaded words, Exhibit 31/Exhibit A also includes references to racially ambiguous words like "spade," "monkey," and "colored."  These words can be used in innocuous contexts, such as quotations from scripts or song lyrics, or even in sentences that contain no reference to race at all, such as "he has talent in spades," "We were just monkeying around," or "I prefer the blue colored background."  Even if the words were used in racial contexts, they could have been contained in incoming e-mails written by non-Defendants, not outgoing e-mails authored by Defendants' employees engaged in the selection of concert promoters.  Mr. Rowe provides no evidence to indicate that the words listed in Exhibit 31/Exhibit A were used in racially discriminatory manners in outgoing e-mails written by employees of Defendants directly involved in concert promotion.  Without such support, Exhibit 31/Exhibit A is too ambiguous to constitute meaningful evidence.

[6] The contents of Exhibit A/Exhibit 31 are discussed in greater detail infra at 13-14.

appeared in incoming or outgoing e-mails, does not describe the context in which the words appeared, and lists the computer identifications of employees, most of whom were not involved in Plaintiffs' concert promotion business and who were therefore irrelevant to Mr. Rowe's claim that these Defendants discriminated against the Plaintiffs (who constituted a group of black concert promoters) in arranging concerts for their clients.

Upon receiving Exhibit 31 with Plaintiffs' opposition to the Booking Agency Defendants' summary judgment motion, Defendants' attorneys sent repeated letter requests to Mr. Rowe's attorneys at the Gary Firm, asking them "to provide foundational information regarding Exhibit 31 or to produce hard copies of the underlying e-mails" purportedly referenced by it. Id. The Gary Firm refused. Id. The Court found that Plaintiffs failed "to present any evidence or argument to show that the e-mails [purportedly referenced in Exhibit 31] constituted utterances by employees of Defendants whose actions were material to the issues in this case." Id. Consequently, the Court determined that the document was too ambiguous to be of any assistance to the evidentiary determinations that the Court had to make and "disregard[ed] Exhibit 31 in its entirety as irrelevant material." Id.

Seven years later, Mr. Rowe attempts to resubmit the exact same document as proof that Defendants' counsel and his former attorneys conspired to sabotage his case, but he has failed to provide anything other than Exhibit 31/Exhibit A to support this claim, to cure the problems with this document that the Court identified in its 2005 judgment, or to address the Gary Firm's failure to provide the Booking Agency Defendants' with foundational information about Exhibit 31/Exhibit A and copies of the underlying e-mails. See id.

Consequently, Mr. Rowe has failed to substantiate the conclusory allegations he makes in his motion papers. This Court will not entertain such baseless accusations.

Most importantly, since 2003, Mr. Rowe, along with the Gary Firm, has had the clear opportunity to investigate the truth or falsity of the claim he now makes that his former attorneys committed a fraud on the court by hiding or deleting e-mail discovery, in violation of Rule 60(d)(3).  In accordance with Magistrate Judge Francis' discovery protocol, Plaintiffs retained Electronic Evidence Discovery ("EED"), a Seattle, Washington-based electronic discovery expert, to create and search mirror images of Defendants' computer hard drives for e-mails to support the Plaintiffs' claims and to provide those e-mails to Plaintiffs' attorneys.  Defendants' submissions confirm that EED had control of mirror images of Defendants' computer hard drives in order to comply with Plaintiffs' search requests.  The documents that Mr. Rowe submitted in connection with this motion show that his former attorneys and the Gary Firm both paid fees on his behalf to EED.  Therefore, if Mr. Rowe believed, as he now asserts, that his former attorneys had not provided his new attorneys with all of the relevant evidence in their possession, he or the Gary Firm at any time in the past seven years could have acquired copies directly from EED of whatever reports or e-mails were sent to his former attorneys, including any documents marked attorneys'-eyes-only.  Indeed, if Plaintiffs' attorneys had hard copies of Defendants' employees' e-mails, they had to have been provided by EED.  Instead, Mr. Rowe alleges, without any support, that the electronic discovery results were destroyed or hidden from him by his former attorneys.

Accordingly, Mr. Rowe's Rule 60 motion is denied as based on nothing more than hot air and paranoid suspicions, the truth or falsity of which he has had the power and the opportunity to investigate for the past seven years.

More detailed analysis of Mr. Rowe's arguments and of the law applicable to his motion follows.

## I.     The Underlying Litigation[7]

### A.     Plaintiffs' Underlying Claim

On November 19, 1998, Mr. Rowe, three other African-American concert promoters, and the concert promotion companies they each owned commenced a lawsuit against eight talent and booking agency defendants and twenty-six concert promoter defendants.  Plaintiffs claimed that Defendants had violated both the Sherman Antitrust Act, 15 U.S.C. § 1, and the Civil Rights Act, 42 U.S.C. §§ 1981, 1985(3), and 1986.  (Pls.' Am. Compl. ("Am. Compl.") ¶¶ 2-3, 5, 12, 14-16, 18-25, 29-55, dated Aug. 9, 1999.)  Specifically, Plaintiffs' Amended Complaint alleged, inter alia, that the Booking Agency Defendants discriminated against Plaintiffs because "black concert promoters are systematically excluded from the promotion of concerts given by white performers . . . [and i]n addition, plaintiffs are regularly excluded from the promotion of concerts given by top-drawing black performers."  (Am. Compl. ¶ 1.)

### B.     Attorney Representation of Plaintiffs

Plaintiffs were originally represented in this case on a contingent fee basis by attorneys Martin Roth Gold ("Mr. Gold") and Christine Lepera ("Ms. Lepera") of the firm Gold, Farrell & Marks.  During the early stages of this litigation, the firm of Gold, Farrell & Marks merged into the firm of RubinBaum, LLP ("RubinBaum").  (Decl. of Raymond J. Heslin in Opp. to Mot. Pursuant to Fed. R. Civ. P. 60(b) ("Heslin Decl.") ¶ 5, May 14, 2012.)  Subsequently, RubinBaum assigned attorneys Richard Primoff ("Mr. Primoff") and Carl Aron ("Mr. Aron") to join Mr. Gold and Ms. Lepera on Plaintiffs' legal team.  (Decl. of Richard G. Primoff in Opp. to Mot. Pursuant to Fed. R. Civ. P. 60(b) ("Primoff Decl.") ¶ 3, May 14, 2012.)  Raymond J. Heslin

---

[7] For the purposes of Mr. Rowe's Rule 60 motion, the Court assumes the reader's familiarity with the lengthy factual background and procedural history of this case.  The Court will therefore only recite facts that are pertinent to Mr. Rowe's Rule 60 motion claiming newly discovered evidence and fraud upon the Court by Plaintiffs' former counsel and attorneys for Defendants WMA and CAA.

("Mr. Heslin"), a partner at RubinBaum and a former partner at Gold, Farrell & Marks, was asked to supervise Plaintiffs' lawsuit.  (Id.; Heslin Decl. ¶ 4.)

On August 1, 2001, members of the Gary Firm, a mid-sized firm based in Florida, filed a motion with the Court to appear pro hac vice, (ECF No. 262), to represent Plaintiffs as co-counsel with RubinBaum and share half of the contingency fee.  (Heslin Decl. ¶ 5.)  On June 1, 2002, RubinBaum merged with the firm of Sonnenschein Nath & Rosenthal ("SNR").  (ECF No. 354.)  On March 28, 2003, SNR withdrew from the litigation and transferred all of its relevant papers to the Gary Firm, which took over sole representation of Plaintiffs.  (Decl. of Martin R. Gold in Opposition to Motion Pursuant to FRCP 60(b) ("Gold Decl.") ¶ 12, May 10, 2012; Heslin Decl. ¶ 15.)

### C.   Magistrate Judge Francis' Discovery Order

Plaintiffs' First Request for Documents included "sweeping" discovery demands.  Rowe Entm't, Inc. v. William Morris Agency, Inc., 205 F.R.D. 421, 424 (S.D.N.Y. 2002).  Some of Plaintiffs' demands were limited to the period from January 1, 1993 to the date the lawsuit was filed, while others contained no date restrictions whatsoever.  (Decl. of Richard G. Primoff in Opp. to Defs.' Mots. for Protective Orders with Respect to E-mail Comm'cns ("Primoff E-mail Decl."), Ex. A, Oct. 26, 2001.)  Indeed, among their thirty-five requests for documents, Plaintiffs sought production of "all documents concerning any communication between any defendants relating to the selection of concert promoters and bids to promote concerts" and "[a]ll documents concerning the selection of concert promoters, and the solicitation, and bidding processes relating to concert promotions."  Rowe, 205 F.R.D. at 424 (emphasis added) (internal citation omitted).  In response, the Booking Agency Defendants moved pursuant to Rules 26(b)(2)(iii) and 26(c) of the Federal Rules of Civil Procedure for a protective order to relieve them of their

8

obligations to produce e-mails responsive to Plaintiffs' requests, arguing that "the burden and expense involved would far outweigh any possible benefit in terms of discovery of additional information." Id.

On January 16, 2002, Magistrate Judge James C. Francis IV issued a lengthy opinion denying the Booking Agency Defendants' motion for a protective order. Id. at 433. Instead, Magistrate Judge Francis outlined a detailed protocol for determining what e-mails were relevant to Defendants' selections of concert promoters and appropriate for production, ordered the Booking Agency Defendants to produce the computer hard drives containing those e-mails in accordance with that protocol. Id. Magistrate Judge Francis' protocol, which laid out a step-by-step procedure for the parties to follow, contained six key provisions:

1. First, Plaintiffs would designate the expert or experts who would be responsible for isolating, separating, and preparing e-mails for review. Defendants would have the opportunity to object to the selected expert(s).

2. Second, Defendants' technical personnel would help Plaintiffs' expert(s) obtain a mirror image of any hard drives containing e-mails as well as a copy of any back-up tapes. Plaintiffs could choose to review a sample of hard drives and tapes instead of all such devices.

3. Third, Plaintiffs' counsel would formulate a search procedure for identifying responsive e-mails and then notify Defendants of the procedure chosen, including any specific word searches Plaintiffs wished to conduct. Defendants could object to any search proposed by Plaintiffs.

4. Fourth, once the parties established an appropriate search method, it would be implemented by Plaintiffs' expert(s). Plaintiffs' counsel could then review the documents generated by the search on an attorneys' eyes only basis.

5. Fifth, once Plaintiffs' counsel identified those e-mails they considered material to this litigation, they would provide those documents to Defendants' counsel in hard copy form with Bates stamps.

6. Sixth, Defendants would then have the opportunity to review the documents produced in order to designate those that are confidential and to assert any privilege. Any purportedly confidential or privileged document would be retained on an attorneys' eyes only basis until any dispute about the designation could be resolved, and the fact

that the document in question had been reviewed by counsel or by an expert would not constitute a waiver of a claim of privilege or confidentiality.

See id. (emphasis added).

### D.   The Parties' Application of Magistrate Judge Francis' Search Protocol

On August 14, 2002, pursuant to Magistrate Judge Francis' Order, Plaintiffs' counsel, Mr. Primoff, sent an e-mail to counsel for the Booking Agency Defendants in which he detailed Plaintiffs' intended methodology for searching the e-mail accounts of the relevant employees of the Booking Agency Defendants.  The e-mail stated, in relevant part, that Plaintiffs intended to search the e-mails of six named employees of CAA and five named employees of WMA.  (Frank Decl., Ex. C.)[8]  Plaintiffs also explained how the e-mail search would be conducted:

> With respect to the periods being examined, plaintiffs will restore and retrieve all email communications between and/or among these users.  In addition, plaintiffs will apply a list of search terms against these accounts, to consist of the following: [long list of terms including "[List of racial slurs]"].

(Id.)

By letter dated September 4, 2002, counsel for Defendant WMA, Sandra McCallion ("Ms. McCallion"), notified Mr. Primoff that "[t]he tape sets you have requested have been collected in WMA's California office and have been sent to your expert's Seattle, Washington office this evening."  (Id., Ex. F.)  She confirmed with Mr. Primoff that the only e-mail accounts from WMA to be searched were those of the specific individuals previously named.  (Id.)  In accordance with the protocol ordered by Magistrate Judge Francis, Ms. McCallion emphasized

---

[8] It should be noted that although the Frank Declaration, dated May 23, 2003, is cited in the Court's opinion granting the Booking Agency Defendants' motion for summary judgment, see Rowe, 2005 WL 22833 at *53 n.143, it is currently either misfiled or missing from the District Court's files.  Accordingly, the Court contacted counsel for CAA and asked for a copy of the Frank Declaration and its attached exhibits.  Counsel was able to fulfill this request except for Exhibit O.  The Court received a binder containing the copy on August 30, 2012.  This binder will be placed in the District Court files with an appropriate notation indicating its origin.

that the WMA Defendants did not "consent . . . to the use by you or your experts of any additional search terms without [WMA's] prior knowledge and consent."  (Id.)  Ms. McCallion then explicitly described the next steps involved in the e-mail discovery protocol, stating that "[a]s you have agreed, the expert will turn over to us the documents yielded by the attached search terms so we can conduct a privilege/work produce [sic] review in advance of your review."  (Id.)

Per Magistrate Judge Francis' protocol, Plaintiffs' experts, EED, then retrieved and restored e-mails from the computer accounts of the specific employees designated by the parties. (Id., Ex. I.)  After reviewing the e-mails produced by EED, counsel for WMA, Helen Gavaris ("Ms. Gavaris"), provided Plaintiffs with hard copies of the e-mails that WMA regarded as "non-responsive" and designated as "attorneys-eyes [sic] only," as well as a privilege log indicating the e-mails WMA designated as privileged.  (Id., Ex. J.)  By letters dated December 4, 2002, and December 10, 2002, WMA instructed Plaintiffs' expert to release the compact discs ("CDs") containing the non-privileged and non-responsive e-mails to Plaintiffs' counsel.  (Id., Ex. K.)

Defendant CAA reacted similarly.  After reviewing EED's results, Ms. Andrea Berner ("Ms. Berner"), counsel for CAA, sent Plaintiffs two CDs containing e-mails that used the agreed upon search terms.  Ms. Berner's November 5, 2002 letter stated that:

> The emails that [CAA] believes are not 'material' to this litigation are contained on Disk No. 2 . . . Pursuant to Judge Francis' Order, all emails, including those on Disk No. 1, are designated as ATTORNEY'S EYES ONLY until such time as we (plaintiffs and CAA) have identified a complete set of emails about which there is no dispute and those emails have been properly designated pursuant to the Protective Order (many of the emails contain sensitive information including credit card numbers, etc.).
>
> Once you have reviewed the emails, please produce to us those emails which you believe are "material to the litigation."  Pursuant to [Judge Francis'] Order, these emails should be produced to us in

> hard copy with Bates stamps.  We will then re-review those emails
> and let you know whether we have any objections to those you
> believe are material so we may proceed accordingly.

(Id.) (emphasis added).  CAA also provided Plaintiffs with a privilege log indicating the e-mails

CAA designated as privileged.  (Id.)

On March 28, 2003, the Court granted SNR's motion to be relieved as Plaintiffs' counsel,

pursuant to Local Rule 1.4.  (Aff. of Raymond J. Heslin in Supp. of  Mot. for Withdrawal of

Counsel dated March 4, 2003, ECF No. 459.)  Plaintiffs, including Mr. Rowe, consented to the

withdrawal of the SNR attorneys from the case.  (Id.)  SNR informed the Court that the "the

three remaining firms, all [of] wh[ich] have appeared as attorneys of record for the plaintiffs, will

continue to prosecute the case."  (Id.)  Prior to withdrawing as counsel, the SNR attorneys

informed the Court that they had "provided their files, including legal research memos, to the

remaining counsel."  (Id.)  Indeed, by letter dated March 13, 2003, Plaintiffs' counsel, Maria

Sperando of the Gary Firm, confirmed that three hundred (300) boxes of documents had been

shipped to the Gary Firm in Florida.[9]  (Let. Attached to Revised Sch. Ord., March 14, 2003, ECF

No. 473.)

The fifth and next step of Magistrate Judge Francis' protocol required Plaintiffs' counsel,

now the Gary Firm, (see Heslin Decl. ¶ 14), to identify those e-mails Plaintiffs considered

material to this litigation and to provide those e-mails to Defendants' counsel in hard copy form

with Bates stamps, see Rowe, 205 F.R.D. at 433.  In her Declaration dated May 23, 2003,

however, counsel for CAA, Beverly Frank ("Ms. Frank"), stated that "Plaintiffs never produced

---

[9] In response to Mr. Rowe's currently pending Rule 60(b) motion, Mr. Gold states that the SNR attorneys withdrew because "Mr. Rowe continuously demanded that the Gary Firm be given increasing responsibility, limiting [the SNR attorneys'] role and our authority to do anything without his personal approval . . . [and thus,] continuing with the case became impossible." (Gold Decl. ¶ 13.)  Mr. Gold further states that after the SNR withdrawal, the Gary Firm "continued to request our assistance, and we complied to the extent we reasonably could."  (Id.)

to CAA, in hard copy with Bates numbers (or in any form) the e-mails they believed to be 'material to this litigation.'" (Id. ¶¶ 25, 40.) Similarly, the record does not indicate that Plaintiffs ever produced the required hard copies of material e-mails to WMA.

       **E.**       **Exhibit 31 to the Booking Agency Defendants' Motion for Summary Judgment**

       In April of 2003, the Booking Agency Defendants moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[10] (ECF No. 493.) Represented by the Gary Firm, Plaintiffs filed opposition papers that included a spreadsheet document marked as Exhibit 31. (Pls.' Joint Mem., Ex. 31; see also discussion supra at note 2.) This was the first appearance in this litigation of the document that Mr. Rowe now falsely characterizes as "newly discovered evidence" in support of his currently pending motion. (See Rowe Aff. ¶ 1; see also discussion of "Exhibit A" supra at 4-6.)

       Exhibit 31 is a document with three columns: the first column contains what appear to be names of Defendants' employees, consisting of a first initial and last name; the second column contains racial slurs, such as "monkey" or "negro;" and the third column contains numbers. For example, reading from left to right across the row, the first entry on the second page of Exhibit 31 reads "DGOLDFARB   spade   3" and the second entry on that page reads "DGROVER colored  2." (Pls.' Joint Mem., Ex. 31 at 2.) According to Mr. Rowe, the document is a summary report listing the number of times a selection of racial slurs – each of which was contained in the parties' agreed upon search terms – were found in the incoming or outgoing e-mails EED retrieved and restored from mirror images of the hard drives and back-up tapes of

---

[10] Between December 10, 1998 and December 18, 2002, the parties filed a series of stipulated orders of dismissal, which released certain Defendants. Consequently, as of April 2003, only the Booking Agency Defendants and two concert promoter companies, Jam Productions Ltd. and Beaver Productions Inc., remained as Defendants in the action.

hard drives of computers assigned to various Booking Agency Defendants' employees.  (See Pls.' Joint Mem. at 15.)

Despite repeated requests by the Booking Agency Defendants' counsel, the Gary Firm refused to explain the provenance of Exhibit 31 or produce the actual underlying e-mails that allegedly contained the racial slurs tallied and reported in Exhibit 31, in violation of Magistrate Judge Francis' protocol.[11]  (Frank Decl., Exs. N, Q.)  Consequently, the Booking Agency Defendants contested the claim that Exhibit 31 accurately represented content retrieved from CAA or WMA e-mails.  (Id., Ex. N.)

Even assuming that it accurately represented the contents of e-mails found in Defendants' employees' computer hard drives, however, the Booking Agency Defendants asserted that it was impossible for them to determine whether the alleged racial slurs were indicative of racial animus by the Defendants.  (Id.)  Indeed, the Booking Agency Defendants noted that Exhibit 31 contains no indication of whether the terms in question were found in *incoming* or *outgoing* e-mail messages.  (Id. ¶ 33 (emphasis added).)  In addition, without access to the underlying e-mails at issue, which were never produced by Plaintiffs, the Booking Agency Defendants argued

---

[11] In response to Plaintiffs' opposition papers, Ms. Frank, counsel for CAA, exchanged a series of letters with counsel for Plaintiffs concerning Exhibit 31.  By letter dated May 8, 2003, Ms. Frank memorialized a telephone conversation held between herself and Plaintiffs' counsel, William Campbell ("Mr. Campbell") of the Gary Firm, in which she verified Plaintiffs' intention to modify their opposition papers by reducing the number of times they assert that the racial slur "nigger" appeared in Exhibit 31 from 349, as originally stated in their opposition papers, to 76. (Frank Decl., Ex. P.)  The letter also states that Ms. Frank requested that Mr. Campbell provide "even one of the e-mails purportedly identified in Exhibit 31"; however, Mr. Campbell "either would not or could not" divulge who authored Exhibit 31 or provide to Defendants the underlying e-mails purportedly described by Exhibit 31. (Id.)  By letter dated May 12, 2003, Ms. Frank once again requested that Mr. Campbell produce the underlying e-mails that formed the basis for Exhibit 31.  (Id., Ex. Q.)  Finally, on May 23, 2003, Ms. Frank submitted to the Court a Declaration in support of the Booking Agency Defendants' Motions for Summary Judgment in which she states that "plaintiffs have not provided CAA or WMA with any information regarding who prepared Exhibit 31 or how it was generated, and have not produced any of the actual e-mails purportedly identified in Exhibit 31." (Id. ¶ 40.)  Ms. Frank's Declaration specifically addresses Plaintiffs' Exhibit 31 and includes exhibits chronicling the correspondence between the parties with respect to Exhibit 31.  (Id.)  Mr. Campbell did not dispute any of Ms. Frank's statements.

that they could not assess the context in which the terms were used, specifically whether the terms were used by their employees in connection with Plaintiffs' concert promotion business. (Id. ¶ 33.)  In fact, the Booking Agency Defendants contended that it is equally plausible that the terms were innocuously contained in "song lyrics, scripts, screen plays, or newspaper articles" written by others and shared over e-mail with employees of the Booking Agency Defendants or "in the course of everyday conversation having no racial animus whatsoever," such as in phrases like "'monkey wrench,' 'monkey business,' 'ace of spades,' or 'Sam Spade.'"  (Id., Ex. N at 2.) Consequently, the Booking Agency Defendants stressed that without the supporting underlying e-mails, Exhibit 31 did not constitute competent or relevant evidence.  (Id.)

In addition, the vast majority of the names listed on the Exhibit 31 spreadsheet are of CAA and WMA employees whose accounts were not part of the search protocol agreed upon by the parties.  (See discussion supra at 9-10.)  According to counsel for the Booking Agency Defendants, the list included the names of numerous employees who worked at CAA and WMA in movies, television, or other departments that were uninvolved with the selection of concert promoters.  (Frank Decl. ¶ 31, Ex. N.)  Defendants contend that these employees' e-mails were not relevant or material to the issues in this litigation, and that Plaintiffs violated Magistrate Judge Francis' discovery order by searching the e-mails of these individuals.[12]  (Frank Decl. ¶ 31.)

---

[12] Indeed, by letter dated May 1, 2003, and sent to the Gary Firm, counsel for CAA, Beverley Frank, asserted that

> In accordance with the Court's protocol, by e-mail dated August 14, 2002, plaintiffs' counsel, Richard Primoff, proposed search terms for the retrieval of CAA's and WMA's e-mails, including names of the specific CAA and WMA personnel whose e-mail accounts would be subject to search.  In a subsequent e-mail dated August 20, 2002, Mr. Primoff agreed the plaintiffs would provide proper notice to CAA and WMA of any changes or additions to the search terms.  Both CAA and WMA agreed to plaintiffs' proposal that the search be limited to the mailboxes of those individuals identified in Mr. Primoff's August 14 e-mail, and plaintiffs never notified defendants that they intended to alter or expand the established search protocol.

On January 5, 2005, the Court issued an 87-page decision granting the Booking Agency

Defendants' motion for summary judgment.  Rowe, 2005 WL 22833.  This decision was

subsequently affirmed by the Court of Appeals.  167 F. App'x 227, cert. denied, 549 U.S. 887.

In its Opinion, the Court addressed Exhibit 31 in a lengthy footnote and found that

> in view of Plaintiffs' new counsel's breaches of Magistrate Judge
> Francis's Order, and Plaintiffs' failure to present any evidence or
> argument to show that the e-mails constituted utterances by
> employees of Defendants whose actions were material to the issues
> in this case, the Court is disregarding Exhibit 31 in its entirety as
> irrelevant material.

Rowe, 2005 WL 22833 at *53 n.143 (emphasis added).  The Court noted that "despite repeated

attempts by CAA and WMA, Plaintiffs' new counsel [the Gary Firm] refused to provide the

Defendants with any foundational information regarding Exhibit 31 or to produce a hard copy of

the underlying e-mails referenced in Exhibit 31," in violation of the agreed upon discovery

protocol prescribed by Magistrate Judge Francis.  (Id.)  Furthermore, the Court found that

Plaintiffs had failed to present any evidence or argument to support their contention that the

allegedly discriminatory e-mails were written, sent, or received by executives of Defendants who

represented vocalists and musical groups in arranging concerts with promoters.  (Id.)  In light of

the fact that Plaintiffs failed to abide by their discovery responsibilities, failed to demonstrate

that the search terms were used in contexts that rendered them racial slurs rather than innocuous

---

[ . . .] Moreover, Exhibit 31 identifies the e-mails of CAA and WMA employees who
have nothing to do with the music business (e.g., the list includes numerous employees
from [the] television and motion picture departments).  To the extent plaintiffs searched
the mailboxes of these employees without the knowledge and consent of CAA and
WMA, plaintiffs clearly have gone beyond the scope of the established protocol and
violated Judge Francis' January 16 Order.

(Frank Decl., Ex. N.)

statements, and refused to provide the underlying e-mails, the Court ruled that Exhibit 31 did not constitute credible evidence of racial animus related to Plaintiffs' lawsuit.  (Id.)

**II.    Mr. Rowe's Current Rule 60 Motion**

On March 2, 2012, approximately ten years after Plaintiffs' experts reviewed the computer hard drives provided by Defendants and approximately seven years after the Court ruled that Exhibit 31 was irrelevant, Mr. Rowe filed the motion currently pending before this Court seeking relief from judgment, pursuant to Rule 60 of the Federal Rules of Civil Procedure. In the affirmation he filed in support of his motion, Mr. Rowe asserts that he has identified and submitted "newly discovered evidence," (Rowe Aff. ¶ 1), and that "officers of the Court" have perpetrated an alleged fraud against the federal court.  (Id. ¶ 2.)  As support for these assertions, Mr. Rowe makes the following statements:

> 5.      Attorney Martin Roth Gold and members of his law firm had ongoing meetings with defendants' counsel, without our knowledge, and conspired to conceal vital e-mail evidence, which we, as plaintiffs paid over $200,000 for.  This crucial evidence comprised of documents that contained the word "nigger" nearly 400 times which clearly demonstrated the racial animus of these defendants as it related to their contractual dealings with plaintiffs.
> 9.      Attorneys . . . Gold, Heslin, Primoff and Lepera advised that nothing had been found as a result of the e-mail search.
>
> 10.     I then asked that they please send all of the entire e-mail search results, which were to be included in all findings and documents, to me.  I carefully examined each document that these attorneys provided to me and found nothing that proved our position against the defendants.
>
> 11.     About two (2) weeks later, I was called to New York for a meeting with Attorney Heslin.  While I was waiting outside of his office I overheard Attorney Heslin on the phone discussing meetings with opposing counsel in my case which he had not previously informed us of.  After going into his office, Attorney Heslin received another call and he turned his back to me for privacy.  I then glanced on his desk and saw a file labeled "Rowe Entertainment v. William Morris, E-Mail results."  It was then that

I observed the word "nigger" was lined on the entire first page of the report. When Attorney Heslin finished his call, I asked him "what was that?" pointing to the e-mail results report on his desk. Attorney Heslin then turned over the report, in my face, and told me that "I was not supposed to see that."

12. I then asked the question "WHY?" since it pertained to my case. Attorney Heslin then got very angry and argumentative with me. I then called Attorney Willie Gary and told his law firm what I had seen on Attorney Heslin's desk. Attorney Gary then asked that the e-mail report be sent to them for review. But, importantly, THOSE E-MAILS WERE NEVER SENT! This is how only the report was finally obtained by the plaintiffs. But Mr. Gold nor Mr. Heslin or their firm, despite my numerous requests for the actual documents (the stack of e-mails) that contained the word "nigger" nearly 400 times, they always, to this date, have refused my request to turn over property that rightfully belongs to me as a plaintiff and which we paid over $200,000 to obtain. Mr. Heslin and Mr. Gold – and others who had knowledge – always [sic] failed to report this (the emails) to law enforcement AND the Court.

18. Specifically, when these same attorneys destroyed the e-mail evidence which Plaintiffs paid over $200,000 to obtain, they committed the crime of destroying evidence . . .

28. I knew justice was not served in this case but it wasn't until I was asked to fly to New York for a meeting on Tuesday, February 7, 2012 that the depth of the injustice was made clear to me.[13]

(Id. ¶¶ 4-5, 8-12, 18, 20, 28.)

Accordingly, Mr. Rowe now asks this Court to (a) vacate and set aside its 2005 summary judgment Order; (b) restore the case to active status; and (c) refer the "newly discovered evidence" to the Criminal Division of the U.S. Attorney's Office, the FBI, the Committee on

---

[13] Notably, nowhere in Mr. Rowe's papers does he state what was "made clear" to him on February 7, 2012 that he was not already aware of when Exhibit 31 was produced by the Gary Firm. Also, nowhere does he explain from whom or how he learned this allegedly new information. Mr. Rowe' states only that it "wasn't until February 7, 2012 that I specifically learned that the actions of [of his former attorneys] constituted various crimes." (Rowe Aff. ¶ 8.) It is well-established in this Circuit, however, that pro se plaintiffs may not rely upon their pro se status or lack of legal sophistication as grounds for relief under Rule 60. See Manney v. Intergroove Tontrager Vertriebs GMBH, No. 10 CV 4493, 2012 WL 4483092, at *3 (E.D.N.Y. Sept. 28, 2012).

Grievances of the Board of Judges of the Southern District of New York, and the Departmental Disciplinary Committee of the New York State Appellate Division, First Department.  (Id. ¶ 1.)

On April 3, 2012, the Court ordered that the Clerk of the Court serve copies of the Rowe motion on Mr. Rowe's former attorneys at SNR, who Rowe alleges engaged in a fraud on the Court.  On May 14, 2012, Mr. Gold, Mr. Heslin, and Ms. Lepera[14] all filed sworn declarations in response.  Mr. Primoff filed his own Declaration in Response the following day, May 15, 2012.  On May 21, 2012, Mr. Rowe submitted Responses to the Declarations of Mr. Primoff and Ms. Lepera.  Mr. Rowe then filed Responses to the Declarations of Mr. Heslin and Mr. Gold on May 31, 2012.

For the reasons stated below, Mr. Rowe's motion is denied.

## III.   <u>Discussion</u>

Where as here, a petitioner proceeds <u>pro se</u>, the claims presented must be liberally construed "to raise the strongest arguments that they suggest."  <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation marks omitted); <u>Simmons v. Abruzzo</u>, 49 F.3d 83, 87 (2d Cir. 1995).  Accordingly, the Court analyzes Mr. Rowe's motion under Federal Rules of Civil Procedure 60(b)(2), 60(b)(3), 60(b)(6), and 60(d)(3), the four provisions of Rule 60 that could apply to it.  Nevertheless, while a court will read a <u>pro se</u> litigant's papers liberally, a <u>pro se</u> litigant is not excused from the requirement of producing highly convincing evidence to support a Rule 60(b) motion.  <u>Alvarado v. Manhattan Worker Career Ctr.</u>, No. 01 CV 9288, 2003 WL 22462032, at *2 (S.D.N.Y. Oct. 30, 2003) (internal citations and quotation marks omitted).

---

[14] Ms. Lepera attaches to her Declaration an excerpt from page 113 of <u>What Really Happened to the King of Pop</u> by Leonard Rowe ("Rowe's book"), self-published in November 2010, in which Mr. Rowe impugns the integrity of this Court, suggesting that the massive amount of money that was at stake in this litigation had played a significant role in the "decision and . . . caused this judge to turn a blind eye and deaf ear to the evidence."  (Id. ¶ 13, Ex. E at 113.) Mr. Rowe further wrote that "race also played a role in [this Court's] decision making.  This was corruption at the highest level."  (Id.)

19

### A.      Mr. Rowe's Claim Pursuant to Rule 60(b)(2)

Motions made under Rule 60(b)(2) based on newly discovered evidence are time barred

if raised more than a year after the date of the entry of the judgment from which the movant

seeks relief.  See Fed. R. Civ. P. 60(c)(1); see also Aponte v. City of New York Dep't. of Corrs.,

377 F. Appx. 99, 100 (2d Cir. May 17, 2010).  Here, the judgment in question – this Court's

Opinion and Order granting summary judgment against Plaintiffs – was entered on February 7,

2005, Rowe, 2005 WL 22833, at * 87, and subsequently affirmed by the Court of Appeals on

December 30, 2005.  167 F. App'x 227, cert. denied, 549 U.S. 887.  Mr. Rowe's motion,

however, was not filed until March 2, 2012.  (See Pl.'s Mot., ECF No. 1.)  Therefore, Mr.

Rowe's claim of newly discovered evidence, (see Rowe Aff. ¶ 1), is time barred under the one-

year statute of limitations applicable to claims made pursuant to Rules 60(b)(2) and 60(b)(3), see

Fed. R. Civ. P. 60(c)(1).

Even if Mr. Rowe had timely filed his claim, he has failed to satisfy the requirements of

Rule 60(b)(2).  In order to receive relief from this Court's summary judgment order based on a

claim of newly discovered evidence pursuant to Rule 60(b)(2), a movant

> must meet an 'onerous standard' by showing that: 1) the newly
> discovered evidence was of facts in existence at the time of the
> dispositive proceeding; 2) he was justifiably ignorant of those facts
> despite due diligence; 3) the evidence is admissible and of such
> importance that it probably would have changed the outcome; and
> 4) the evidence is not merely cumulative or impeaching.

Int'l Bhd. of Teamsters, 247 F.3d at 392.  Here, none of the documents Mr. Rowe has submitted

in support of his currently pending Rule 60 motion satisfy this "onerous standard."  Id.

Mr. Rowe has only filed one document, Exhibit A, that is relevant to his allegation that

his former attorneys possessed e-mails demonstrating Defendants' racial animus but concealed

them from Plaintiffs.[15]  As discussed <u>supra</u> at 4-6, 13-16, Exhibit A appears to be a summary

print out from the electronic discovery conducted by Plaintiffs' experts on the Defendants'

computer hard drives.  (<u>See</u> discussion of Exhibit A <u>supra</u> at 4-6.)  Mr. Rowe attaches identical

copies of this document to each of his responses to the declarations filed by his former attorneys.

(<u>See</u> Resp. to Gold, Ex. A; Resp. to Primoff, Ex. A; Resp. to Lepera, Ex. A; Resp. to Heslin, Ex.

B.)  Mr. Rowe regards Exhibit A as a "newly discovered" smoking gun containing irrefutable

evidence of racial animus that demands that this Court grant his Rule 60(b) motion in the

interests of justice.[16]

      Exhibit A is none of these things, however.  First, as pointed out by Mr. Heslin in his

June 27, 2012 letter to the Court, Exhibit A is in fact the exact same spreadsheet document that

the Gary Firm previously filed with the Court as Exhibit 31 in connection with Plaintiffs' July

23, 2004 response to the Booking Agency Defendants' motion for summary judgment.  (Heslin

Letter of June 27, 2012 at 1.)  Indeed, Mr. Rowe implicitly acknowledges this.  His submissions

of Exhibit A in support of this motion all contain the cover page from the original filing of the

spreadsheet as Exhibit 31.  (<u>See</u> Resp. to Gold, Ex. A; Resp. to Primoff, Ex. A; Resp. to Lepera,

Ex. A; Resp. to Heslin, Ex. B.)  The cover page is titled "Exhibits to Plaintiffs' Memorandum of

Law in Opposition to Booking Agency Defendants' Motion for Summary Judgment," is stamped

"Received July 22, 2004, Chambers of Judge Robert P. Patterson," and includes contact

information for the Gary Firm.  (<u>Id.</u>)  Consequently, it is indisputable that Exhibit A does not

---

[15] Mr. Rowe submitted four other types of documents, but none of these are relevant to his allegations.  These other documents are discussed <u>infra</u> at 22-23.

[16] Indeed, Mr. Rowe appears to have engaged in a media tour in which he distorts the history of this case, disparages this Court, trumpets Exhibit A as proof of racial animus, and calls for sympathetic listeners to write to this Court and call for Plaintiffs' case to be reopened.  Mr. Rowe's campaign of misinformation has resulted in the Court receiving approximately 60 such letters, all of which are form letters or form postcards that have been docketed and filed.  The letters suggest that Mr. Rowe aired his unsubstantiated complaints on Roseanne Barr's radio show.

constitute "newly discovered evidence . . . of facts in existence at the time of" the Court's

January 5, 2005 Opinion and Order granting summary judgment, but of which Plaintiffs were

"justifiably ignorant . . . despite due diligence." Int'l Bhd. of Teamsters, 247 F.3d at 392.  Thus,

Mr. Rowe has failed to satisfy the requirements of Rule 60(b)(2).

 In addition, Exhibit A/Exhibit 31 is not "of such importance that it probably would have

changed the outcome" if the Court had the opportunity to consider it before rendering its

judgment, Int'l Bhd. of Teamsters, 247 F.3d at 392. The Court reviewed and discussed the

admissibility of Exhibit 31 in evaluating the Booking Agency Defendants' summary judgment

motion.  See Rowe, 2005 WL 22833, at *53 n.143.  Indeed, as discussed supra at page 16-17, the

Court discussed Exhibit 31 at some length in connection with its summary judgment decision

and found that the document failed to meet the standard for admissible evidence due to the Gary

Firm's refusal to provide Defendants with hard copies of the underlying e-mails, in violation of

Magistrate Judge Francis' discovery order, and Plaintiffs' failure to show that the underlying e-

mails referenced by Exhibit 31 reflected racial animus by Defendants' employees engaged in

selecting concert promoters.  Id.

 In addition to Exhibit A, Mr. Rowe has submitted an unnumbered one page excerpt from

Plaintiffs' brief opposing the Booking Agency Defendants' motion for summary judgment,

(Resp. to Gold, Ex. A); a summary of the settlement amounts disbursed in this case, (id., Ex. B);

bills from both SNR and the Gary Firm, dating from December 20, 2002 to November 20, 2003,

(id.); and news articles from 2007 and 2012 reporting on allegations by a litigant of misconduct

within the First Department Disciplinary Committee, (Resp. to Heslin, Ex. C.)  These documents

do not constitute "newly discovered evidence" either.  The one page excerpt from the Plaintiffs'

brief and the news articles do not present facts relevant to this litigation that were "in existence at

the time of the dispositive proceeding." <u>Int'l Bhd. of Teamsters</u>, 247 F.3d at 392.  Meanwhile,

although the summary of settlement disbursements and attorney bills do contain facts, Mr. Rowe

has provided no indication that those facts are relevant to his motion or that he "was justifiably

ignorant of those facts despite due diligence" at the time this Court issued its summary judgment

order in 2005.  <u>Id.</u>  Moreover, none of these documents are "of such importance that [they]

probably would have changed the outcome" of the summary judgment proceeding.  <u>Id.</u>

Accordingly, none of the documents Mr. Rowe has submitted in support of his currently pending

Rule 60 motion satisfy the "onerous standard" for receiving relief pursuant to Rule 60(b)(2).  <u>Id.</u>

**B.     Mr. Rowe's Claim Pursuant to Rule 60(b)(3)**

Mr. Rowe's allegations include the claim that Defendants' counsel participated in a

conspiracy with the SNR attorneys to conceal and destroy e-mails.  (Rowe Aff. ¶¶ 5, 19.)  He

charges that "Attorney Martin Roth Gold and members of his law firm had ongoing meetings

with defendants' counsel, without our knowledge, and conspired to conceal vital e-mail

evidence, which we, as plaintiffs paid over $200,000 for," (<u>id.</u> ¶ 5), and "when these same

attorneys, with the conscious input from their co-conspirators on the defense side of the table,

came into this Court and lied, on the record, they committed the crime of perpetrating a 'fraud

upon this Court,'" (<u>id.</u> ¶ 19).  It should be stated first that the SNR attorneys never "came into

this Court and lied, on the record. . . ."  (<u>id.</u>)  By the time of the Booking Agency Defendants'

summary judgment motion and its oral argument, the SNR attorneys had withdrawn as counsel

for Plaintiffs.  Counsel for Defendants argued against the Gary Firm.  Secondly, claims under

Rule 60(b)(3) are subject to the same one-year statute of limitations applicable to claims under

Rule 60(b)(2).  <u>See</u> Fed. R. Civ. P. 60(c)(1).  Given that Mr. Rowe did not file his current motion

until approximately seven years after the entry of judgment, his claim against Defendants' counsel pursuant to Rule 60(b)(3) is time-barred.  See Aponte, 377 F. Appx. at 100.

Even if Mr. Rowe had timely filed his claim, relief under Rule 60(b)(3) "cannot be granted absent clear and convincing evidence of material misrepresentations" by the adverse party that precluded the movant from fully presenting its case.  Fleming, 865 F.2d at 484.  Here, other than the conclusory statements in his affirmation and the inadmissible hearsay statement discussed infra at 28-29, Mr. Rowe has provided no support whatsoever for his allegation that Defendants' counsel engaged in a conspiracy with his former attorneys.  Accordingly, the Court finds that Mr. Rowe's wholly unsubstantiated claim of misconduct by Defendants' counsel is nothing more than hot air.

### C.  Mr. Rowe's Claim Pursuant to Rule 60(b)(6)

Rule 60(b)(6) serves as a catchall provision that allows the Court to negate the effect of a previous judgment "for any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  Although the Federal Rules of Civil Procedure do not designate a specific deadline for submission, a Rule 60(b)(6) claim must be filed "within a reasonable time" after the entry of judgment.  Fed. R. Civ. P. 60(c)(1).  Courts in the Second Circuit have found delays exceeding eighteen months to be unreasonable absent mitigating circumstances, Maisonet, 2011 WL 317833, at *3 (citing cases), or a showing of good cause for the delay, Korelis, 1999 WL 980954, at * 1 (internal citation omitted).

Here, approximately seven years have elapsed since this Court's entry of judgment.  Mr. Rowe's only proffered explanation for this delay is that "[w]hile I was generally informed about one year ago that my case may have involved 'ineffective counsel' and/or other certain unethical attorney actions, is [sic] wasn't until February 7, 2012 that I specifically learned that the actions

constituted violations of various crimes." (Rowe Aff. ¶ 8.)  This vague explanation does not

constitute good cause.  Indeed, Mr. Rowe has failed to show why he could not have filed this

motion at the time the Gary Firm filed Exhibit 31 with the Court in 2004, (see discussion supra at

13-16), or by April 6, 2010, when he lodged an ethics complaint against Mr. Gold and Mr.

Heslin with the Executive Director of the New York State Bar and the Departmental Disciplinary

Committee for the First Department.[17]  Shortly thereafter, Mr. Rowe wrote a second letter

communicating these same complaints to the Chairman and the New York Managing Partner of

SNR, (see Gold Decl. ¶ 3, Ex. B at 1), and in November 2010 he self-published a book repeating

the exact same allegations he raises here, (see Decl. of Christine Lepera in Opp. to Mot. Pursuant

to Fed. R. Civ. P. 60(b), dated May 14, 2012 ("Lepera Decl."), Ex. A.)  It is clear from Mr.

Rowe's recent writings that he was fully aware of Exhibit 31, which forms the basis for his

current Rule 60 motion, at least twenty-three months before he filed his claim.  More

importantly, his own statements in the affirmation filed in support of this motion, (see Rowe Aff.

¶¶ 11-12), suggest that he has been aware of Exhibit 31 since observing it on the desk in Mr.

---

[17] Mr. Rowe's April 6, 2010 letter complaint charges that Mr. Gold and Mr. Heslin, in breach of their
fiduciary duties, intentionally failed to disclose to Plaintiffs

> discovery information that had been received which literally revealed that the defendants
> [William Morris Agency and Creative Artists Agency and other defendants] had used the
> derogatory term "niggers" or variants thereof, over 230 times in official documentation,
> e-mails and related items between defendants in their ongoing efforts to keep African
> American Promoters from a fair chance to compete in the business.

(Gold Decl., Ex. C at 1; see also Heslin Decl. ¶ 2.)  The complaint was subsequently transferred to the Second
Judicial Department, as Mr. Gold was a member of the Disciplinary Committee in the First Department.  (Gold
Decl. ¶ 4.)  Mr. Gold and Mr. Heslin inform the Court that the complaint was dismissed by the Disciplinary
Committee in the Second Judicial Department.  (Id.; Heslin Decl. ¶ 16.)  Mr. Rowe blames this dismissal on the
"corruption and collusion that permeates" the Second Judicial Department's Disciplinary Committee.  (Reply Aff. of
Pl. Leonard Rowe in Response to the Gold Decl. ("Resp. to Gold") ¶ 4.)  Mr. Rowe provided no evidentiary support
for his corruption allegation; instead, he cited two news articles and one e-mail alert discussing a former
Disciplinary Committee staff attorney's "whistleblower" claim of wrongful discharge.  (Resp. to Heslin ¶ 2(j).)  The
Court notes that a jury rejected the former staff attorney's claim, and the appellate court affirmed the verdict.  (Id.,
Ex. C.)

Heslin's office around the time discovery closed in 2002, (see Disc. Order, ECF No. 347, May 1, 2002), and the same document was filed by Plaintiffs on July 23, 2004 in opposition to the Booking Agency Defendants' summary judgment motion.  Accordingly, the Court finds that Mr. Rowe has failed to show good cause or mitigating circumstances excusing his delay, and therefore his claim under Rule 60(b)(6) is time-barred.

Even if Mr. Rowe had timely filed his claim, he has failed to demonstrate the "extraordinary circumstances or extreme and undue hardship" required to receive relief pursuant to Rule 60(b)(6).  Dow Jones, 1998 WL 2370, at *2.  Mr. Rowe offers no evidence in support of a claim under Rule 60(b)(6) other than his own conclusory allegations.  Although Mr. Rowe alleges that "[t]he previous ruling that was entered by this Court single handedly destroyed practically all black business that were dependent on the black concert promoters . . . ."  (Rowe Aff. ¶ 22), that "[t]he ongoing and continuous hardship has been gut wrenching, emotionally draining, and economically devastating," (id. ¶ 26), that "a hearing is required . . . in the interest of justice," (id. ¶ 16), he provides no evidence to substantiate these claims.  Accordingly, he has failed to show the "extraordinary circumstances or extreme and undue hardship" required by Rule 60(b)(6).

### D.  Mr. Rowe's Claim Pursuant to Rule 60(d)(3)

#### a.  Miscellaneous Claims

Mr. Rowe also claims that his former SNR attorneys – specifically Mr. Gold, Mr. Heslin, Mr. Primoff, and Ms. Lepera – engaged in a conspiracy with Defendants' counsel to sabotage his case, thus committing fraud upon the court.  (See Rowe Aff. ¶¶ 2-21, 28, 30, 34-36, 38); see also Fed. R. Civ. P. 60(d)(3).  Although claims under Rule 60(d)(3) are not subject to their own statute of limitations, a movant whose allegations properly fall under Rule 60(b)(3) but who

inexcusably fails to file a timely claim for relief within Rule 60(b)(3)'s one year statute of limitations may not salvage the claim by filing under Rule 60(d)(3) instead.  See Anderson v. New York, No. 07 CV 9599, 2012 WL 4513410, at *4 (S.D.N.Y. Oct. 2, 2012).  Accordingly, given that Mr. Rowe's claim that Defendants' counsel engaged in misconduct is time-barred under Rule 60(c)(1), his Rule 60(d)(3) claim that Defendants' counsel committed fraud upon the Court is time-barred as well.  Rule 60(b)(3) does not cover Mr. Rowe's allegations against his own former attorneys, however.  Consequently, his Rule 60(d)(3) claim against them is not time-barred.  See Fed. R. Civ. P. 60(d)(3).

In order to receive relief from the summary judgment order entered in this case based on his claim that his former attorneys conspired with Defendants' counsel to hide material evidence from the Court or otherwise sabotage his case, Mr. Rowe must show that the conduct he alleges "seriously affect[ed] the integrity of the normal process of adjudication" by "actually deceiv[ing] the court."  Anderson, 2012 WL 4513410, at *4; see also Fed. R. Civ. P. 60(d)(3).  If Mr. Rowe fails to show that the Court's decision was "influenced by the conduct at issue, the judgment should not be set aside."  Anderson, 2012 WL 4513410, at *4.  The Court will address each of Mr. Rowe's related accusations in turn.

First, Mr. Rowe alleges that the conspiracy between Defendants and his former attorneys was fostered by the fact that Mr. Heslin and Mr. Gold had a prior relationship with Dale Head, the General Counsel for Defendant SFX Clear Channel.  (Rowe Aff. ¶ 13.)  Mr. Rowe states that "during settlement discussions with Clear Channel, [and other Defendants], I was always pressured by Attorney Martin Gold and his firm to settle under the continual threat of their withdrawal from the case."  (Id.)  Mr. Rowe's allegation that Mr. Heslin and Mr. Gold's prior relationship with Mr. Head influenced settlement talks is unsubstantiated by factual evidence.

As an initial matter, Mr. Rowe settled with Defendant Clear Channel for $8,000,000.  No decision by this Court was involved, and thus no decision by this Court was influenced at all by the conduct of Mr. Gold and Mr. Head in these negotiations.  See Anderson, 2012 WL 4513410, at *4.  Furthermore, Mr. Rowe's Rule 60(b) motion papers do not state how Mr. Heslin's prior relationship with Mr. Head might have adversely affected the settlement he obtained from Defendant Clear Channel.  To the contrary, Mr. Heslin asserts that his relationship with Mr. Head bridged the "distrust between both parties" and eventually led to mediation between the parties.  (Heslin Decl. ¶ 9.)  While that mediation was ultimately unsuccessful, the parties did subsequently reach a substantial settlement agreement without any involvement from the Court.  (Id. ¶ 11.)  Consequently, Mr. Rowe has made no showing that he or the Court was "deceived" in any material way by Mr. Heslin and Mr. Gold's prior relationship with Mr. Head.  See Anderson, 2012 WL 4513410, at *4.

Next, Mr. Rowe alleges that the SNR attorneys refused to ask Defendants pertinent questions during deposition testimony in furtherance of the conspiracy between the SNR attorneys and Defendants.  (Rowe Aff. ¶ 14.)  As evidence of this alleged conspiracy, Mr. Rowe recounts hearsay, namely a conversation overheard by Plaintiff Lee King during a break in the deposition of Rob Light, a CAA employee, in which Mr. Light was allegedly told by CAA attorneys that he would not be asked "any hard questions" by SNR attorney Carl Aron.  (Id.) This claim is not supported by any factual evidence demonstrating that Mr. Light was, in fact, asked no "hard questions."  Furthermore, as hearsay, this statement cannot be credited by the Court.  Lastly, Mr. Rowe has failed to show in any way how the Court's summary judgment decision was influenced in any way by misconduct during the deposition of Mr. Light.  See Anderson, 2012 WL 4513410, at *4.

28

b.  Mr. Rowe's Claim that the SNR Attorneys Committed Fraud on the Court

Finally, Mr. Rowe claims that the SNR attorneys committed fraud on the court by concealing and then destroying "vital e-mail evidence," specifically the e-mails of Defendants' employees produced by Plaintiffs' electronic discovery expert, EED.  (Rowe Aff. ¶¶ 2-21, 28, 30, 34-36, 38.)  According to Mr. Rowe, these e-mails contained hundreds of racial slurs, including the word "nigger" nearly 400 times.[18] (Id. ¶¶ 5-6, 9-12, 18-19.)  Mr. Rowe contends that these e-mails clearly demonstrate Defendants' racial animus "related to their contractual dealings with plaintiffs."  (Id. ¶¶ 5, 12.)  He argues that "had attorney Martin Gold and his co-conspirators not perpetrated this fraud upon the court by their intentional concealment of these documents (the e-mails) and other vital evidence of anti-trust violations . . . I truly believe that this Court would have reached a different outcome on summary judgment."  (Id. ¶ 5.)  Mr. Rowe bases this allegation on the e-mail report Mr. Rowe claims to have seen on Mr. Heslin's desk, which was first submitted to this Court in 2004 as Exhibit 31 and is now resubmitted by Mr. Rowe as Exhibit A.  (Id. ¶¶ 11-12.)

1.  *The denials of Mr. Rowe's former attorneys*

In their sworn declarations filed in response to Mr. Rowe's Rule 60 motion, SNR attorneys Gold, Primoff, Heslin, and Lepera each deny and refute Mr. Rowe's allegations, stating, in sum and substance, that the e-mail search conducted by Plaintiffs' experts yielded no relevant documents that would have been of use in proving Plaintiffs' claims.  (See Gold Decl. ¶ 11; Lepera Decl. ¶ 6;[19] Heslin Decl. ¶ 7; Primoff Decl. ¶ 3.)  Moreover, the SNR attorneys assert

---

[18] In other sections of his brief, Mr. Rowe states that the word "nigger" was used 349 times.  In a letter to Ms. Frank dated May 9, 2003, however, Mr. Campbell admitted that this was an inflated number and that Exhibit 31 instead shows 76 appearances of the word.  (Frank Decl., Ex. Q at 2.)

[19] Ms. Lepera's declaration and Mr. Rowe's response to it are of limited assistance to the Court in resolving this case.  In her declaration, Ms. Lepera states that she has "no recollection" of having advised Mr. Rowe that nothing

that "all documents (including e-mails) were turned over to co-counsel [the Gary Firm] once the Court approved SNR's withdrawal."  (Heslin Decl. ¶ 2; see also id. ¶ 15; Gold Decl. ¶ 12; Lepera Decl. ¶ 4.)

Specifically, SNR's Richard Primoff, who conducted the e-mail discovery,[20] asserts that because Mr. Rowe did not include a copy of the report he refers to as the "e-mail results report" in his initial motion papers, he cannot be sure to what document Mr. Rowe is referring; however, he remembers that

> [T]here was a preliminary statistical report prepared by [P]laintiff's electronic evidence consultants that was to be used to decide whether it was worthwhile for [P]laintiffs to pay additional and (substantial) sums to initiate a second, and wider, search of Defendant's e-mail files, according to the protocol established by U.S. Magistrate Judge Francis in the case.

(Primoff Decl. ¶ 4.)  Mr. Primoff further declares that as of the time he left SNR in mid-January 2003, he "was not aware of any decision by Plaintiffs (or the Willie Gary firm, which Plaintiffs had brought in to replace us) to initiate or pay for a second e-mail search of Defendants' files,"

---

had been found as a result of the e-mails searched (as claimed in Mr. Rowe's moving Decl. ¶ 9), and that she has no "knowledge of e-mails that are of the nature described vaguely by Mr. Rowe's motion.  [She] was not involved in e-mail discovery and the details of that process."  (Lepera Decl. ¶ 6; see also id. ¶ 4.)  Ms. Lepera further states that "[t]o the extent that Mr. Rowe is insinuating that I had any knowledge of or participation in his theoretical 'conspiracy' his insinuation is wholly fabricated.  It is in fact outrageous in the extreme . . . and categorically untrue.  (Id. ¶ 7.)  In his response, filed on May 21, 2012, Mr. Rowe asserts that Ms. Lepera "was, to the best of [his] recollection, involved in all facets of the case including the withholding of the crucial evidence directly at issue in this case;" however, Mr. Rowe has not provided support for this allegation.  (Resp. to Lepera ¶ 5.)  Accordingly, the Court declines to credit his characterization of Ms. Lepera's involvement.

In addition, Mr. Rowe suggests that Ms. Lepera's request that this Court "not grant Plaintiff's motion to reinstate this case . . . can only be construed as an implicit admission of her and her co-conspirator law partner's [sic] true intentions and guilt."  (Id. ¶ 7.)  Mr. Rowe's nonsensical conclusion that Ms. Lepera's denial of wrongdoing is equivalent to an admission of culpability provides insight into his (in)ability to think straight about his claims.

[20] Mr. Primoff, currently with the SEC, explains that he was a member of the firm of RubinBaum in 2001 and through the first half of 2002; he was then of counsel to SNR from the latter half of 2002 until mid January 2003, at which point he left to join the SEC.  (Primoff Decl. ¶ 2.)

nor did Mr. Primoff "ever see, nor was made aware of, any additional e-mail production beyond the disappointing production that [he] reviewed."  (Id. ¶ 5.)

In his declaration, Mr. Heslin confirmed that SNR and the Gary Firm were serving as co-counsel to Plaintiffs during the electronic discovery of Defendants' e-mail accounts.  (Heslin Decl. ¶ 6.)  According to Mr. Heslin, he learned from Mr. Primoff that "nothing of consequence had been found."  (Id. ¶ 7; see also Primoff Decl. ¶ 3.)  Mr. Heslin reports that "Mr. Rowe was told this and certainly never found anything to the contrary on my desk."[21]  (Id. ¶ 7.)  Mr. Heslin further states that

> [o]nce the Court approved SNR's withdrawal, I arranged with Mr. Gary's firm the transfer of all our files and personally supervised the delivery of them to a truck sent by Mr. Gary.  All files including the e-mail discovery were provided to Mr. Gary's firm which if they contained the derogatory language Mr. Rowe claims, I assume Mr. Gary's firm would have used in response to the defendants' summary judgment motion.

(Id. ¶ 15.)

On July 9, 2012, the Court received a letter from Mr. Heslin, dated June 27, 2012, in which he states that SNR attorneys were never "provided with copies of the e-mails that are allegedly referenced in [the report marked as Exhibit A] – and Mr. Rowe provides no evidence to the contrary."  (Heslin Letter of July 9, 2012 at 3.)  According to Mr. Heslin, "the search was conducted by the vendor on its own accord and [SNR] was provided with the results only;" the "only e-mails [SNR] received from defendants pre-dated this list."  (Id.)  He states that he is "unaware as to whether the Gary Firm received the e-mails."[22]  (Id.)  Finally, Mr. Heslin contends that "Mr. Rowe offers no evidence whatsoever that I or any of my colleagues received

---

[21] Moreover, Mr. Rowe states that he conducted his own review of the e-mail results provided to him by the SNR attorneys and "found nothing that proved our position against the defendants."  (Rowe Aff. ¶ 10.)

[22] The Gary Firm has not filed any papers in support of Mr. Rowe's Rule 60(b) motion.

anything of value from defendants' attorneys (or anyone else) in furtherance of this so-called conspiracy." (Id. at n.1.)  Indeed, Mr. Rowe has filed no evidence or supporting affidavits to dispute Mr. Heslin's statements.

Echoing Mr. Heslin's statements, Mr. Gold asserts in his declaration[23] that "I have no knowledge that the word 'nigger' appeared in documents produced by defendants, and I still have no knowledge that the word so appears.  Notably, Mr. Rowe has produced no such documents." (Gold Decl. ¶ 11.)  Mr. Gold points out that Mr. Rowe may be right that certain documents produced by defendants were not made available to the plaintiffs by his firm because the Defendants sought and obtained a protective order allowing "them to mark certain documents to be restricted only to counsel." (Id. ¶ 12; see also Magistrate Judge Francis' protocol ¶ 4 (stating that "[a]ny purportedly confidential or privileged document shall be retained on an attorneys'-eyes-only basis until any dispute about the designation is resolved"), discussed supra at 9.)  Mr. Gold states that "documents so marked were withheld from the plaintiffs, but later delivered to the Gary Firm when my firm was relieved." (Gold Decl. ¶ 12.)

### 2.  Mr. Rowe's responses to his former attorneys' denials

In his responses to each of these declarations, Mr. Rowe accuses his former attorneys of lying and points to Exhibit A as proof.  Indeed, in his Response to the Declarations of Attorney Richard Primoff ("Resp. to Primoff"), dated May 22, 2007, Mr. Rowe asserts that Mr. Primoff's statement that "'nothing had been found to help our case'" is "proven to be totally untrue . . . by

---

[23] Mr. Gold's Declaration, dated May 14, 2012, begins by acknowledging that the facts recited within it were all based on his memory of events nine years old since his firm had turned over all of its relevant files to the Gary Firm without means of retaining copies, (Gold Decl. ¶ 2, n.1), and noting that he and other lawyers of his firm withdrew as plaintiff's counsel on March 28, 2003, over nine years earlier, (id. ¶ 1).

the contents of Exhibit 'A.'"[24]   (Resp. to Primoff ¶ 4.)  Mr. Rowe chooses to overlook, however,

that Exhibit 31/Exhibit A does not differentiate between incoming and outgoing e-mails, that

many of the employees listed were not engaged in the selection of concert promoters, and that

rap lyrics commonly include racial language.

Similarly, in his unsworn Response to the Declarations of Attorney Raymond J. Heslin,

dated May 28, 2012 ("Resp. to Heslin"), Mr. Rowe maintains that Mr. Heslin's statement that

"no derogatory terms (232, 349 or 400) were located in the e-mails of defendants," (Heslin Decl.

¶ 1), "flies in the face" of what Mr. Rowe claims is "the undisputed evidence contained in the

summary of defendant's e-mail racial slur results" attached as Exhibit B.   (Resp. to Heslin ¶¶ 1,

2(e).)  Mr. Rowe claims this is the same document he saw on Mr. Heslin's desk before Mr.

Heslin turned it over and said "'you are not supposed to see that.'"  (Id. ¶ 7.)  Accordingly, Mr.

Rowe claims that "Mr. Heslin would lie under oath and try to have this Court believe that [no

racial slurs were] contained in the e-mails themselves."[25]  (Id. ¶ 2(e).)

Finally, in Mr. Rowe's May 28, 2012 sworn response to Mr. Gold's sworn declaration, he

attaches Exhibit A as "evidence of e-mails by executives at William Morris and Creative Artists

Agency containing the word 'nigger' and other derogatory terms.  (Id. ¶ 5.)  Based on Exhibit

31/Exhibit A, Mr. Rowe contends that Mr. Gold's statement that "he 'had no knowledge' of this

---

[24] Mr. Rowe also claims that "Exhibit 'A' is missing both page 1 and page 17" and "is a direct copy that was pulled
from the Court's files, which suggests that someone other than the Plaintiffs has intentionally removed or
deliberately misplaced these pages."  (Id. ¶ 11.)  This statement is nonsensical.  The Court will not entertain Mr.
Rowe's outrageous and speculative insinuation that a member of the Court's administrative staff manipulated the
records.  Moreover, the document marked as Exhibit A was generated for Plaintiffs by EED and, as discussed supra
at page 31, was originally produced to the Court by the Gary Firm, Plaintiffs' counsel, as Exhibit 31 to Plaintiffs'
opposition to the Defendants' summary judgment motion.  If Mr. Rowe lacks a complete copy of this document, it is
no fault of "someone other than the Plaintiffs."

[25] Mr. Rowe also asserts that Mr. Heslin's statement that Mr. Gary received the actual e-mail discovery documents
from SNR is totally false, (Resp. to Heslin ¶ 2(h)), and that he is "certain that if Mr. Gary had actually received the
e-mail documentation that is at issue in this matter, he would have presented them" to the Court, (id. ¶ 15).

. . . def[ies] logic and stands as one of the most incredulous statements that a senior attorney, charged with supervising the work and conduct of assistants that work with him, could make." (Id. ¶ 6.)  Mr. Rowe also states that "Exhibit 'A' already establishes that Mr. Gold is guilty of penalty of perjury and fraud upon the Court . . . ."  (Id. ¶ 10.)

In his response to Mr. Primoff's declaration, Mr. Rowe states that Mr. Primoff's description of Exhibit 31 is "is a total fabrication because Plaintiffs paid over $200,000 dollars to produce the e-mail results of the Defendants and a second e-mail search was never discussed by [Mr. Rowe] or other Plaintiffs with anyone."  (Resp. to Primoff ¶ 9.)[26]  Accordingly, on June 5, 2012, this Court ordered Mr. Rowe to support his assertion "by producing the bill or bills for such services that Plaintiffs are alleged to have paid."  (Order dated June 5, 2012, ECF No. 777.)

### 3.  Mr. Rowe's response to this Court's June 12, 2012 Order

On June 12, 2012, Mr. Rowe filed Plaintiff's Response to Court's Order Dated June 5, 2012 ("Pl.'s Resp. to 6/5/12 Ord.") and attached, marked as Exhibit A, a settlement statement, dated May 14, 2002, of plaintiff's claims against the Clear Channel/SFX defendants for an initial payment of $4.5 million.  (Pl.'s Resp. to 6/5/12 Ord., Ex. A.)  The settlement statement shows reimbursement of disbursements to RubinBaum of $347,847.94 and to the Gary Firm of $100,000.  (Id.)  This settlement statement did not, however, provide the specific proof the Court requested in its June 5, 2012 Order.[27]

---

[26] The $200,000 Plaintiffs paid to EED reflects the amount paid to conduct e-mail discovery on all Defendants, not just the Booking Agency Defendants.  See Rowe, 205 F.R.D. at 424-26, 428-32; (see also Resp. to Heslin, Ex. A (bills indicating distributions from settlements with the Howard Rose Agency, dated August 8, 2002; Monterey, dated December 20, 2002; and Clear Channel/SFX, dated May 14, 2002 and November 20, 2003).)

[27] Although Mr. Rowe does not substantiate his claim that Plaintiffs "paid over $200,000 to produce the e-mail results of the Defendants," (Resp. to Primoff ¶ 9), the Court notes that on May 28, 2012, in response to Mr. Heslin's declaration, Mr. Rowe submitted a partial document from the Gary Firm that reflects that the Gary Firm paid EED $4,335.24 on behalf of Plaintiffs.  (See Resp. to Heslin, Ex. A.)  This partial document is entitled "Closing Statement – Client #40201" and bears a fax transmission marking indicating that it was sent to RubinBaum on April 15, 2002.  (Id.)

Mr. Rowe points out in his response that RubinBaum "did not itemize its settlement statement which would have pointed out that" the e-mail delivery company was "Electronic Evidence Discovery of Seattle, Washington." (Id. ¶ 1.) Mr. Rowe further states that "[i]t would appear, that the failure of the attorneys to provide an itemized bill or receipt violates State Bar Rule 1.15(d)(1)(iii), (iv), (v) and (vi) which requires attorneys to maintain certain records and billing documentation for clients for seven (7) years including contingent fee agreements and bills for services rendered and paid to outside vendors . . . ." (Id.) In essence, Mr. Rowe appears to be contending that he cannot provide the Court with bills reflecting the amount paid to EED because no such itemized bills were provided to him by his attorneys.

In addition, attached as Exhibit B to his response, Mr. Rowe filed an Affidavit, dated June 7, 2012 ("6/7/12 Rowe Aff."), in which he states that he "was the primary plaintiff that the attorneys procured their authorization and permission to proceed on any and all aspects of this case including but not limited to discovery matters and e-mail searches." (6/7/12 Rowe Aff. at 2.) Mr. Rowe further states that "[a]fter Plaintiff's attorneys had deducted $200,000 from Plaintiffs' share of the first Clear Channel settlement proceeds . . . and deliberately lied to us by saying nothing was found that would help our case, there was never any talk about a second e-mail search with Attorney Primoff or anyone." (Id.) Mr. Rowe claims that "[t]his is evidenced by the fact that none of the other attorneys have raised anything remotely similar to the mendacious assertions Mr. Primoff has made." (Id.)

Also contained within the Exhibit B attachment to Rowe's Response is an affidavit of plaintiff Lee King, sworn to on June 7, 2012 ("6/7/12 King Aff."), which states in pertinent part that "I recall specifically all conversations that were held with us by the attorneys that were representing us at that time regarding the e-mail search of the defendant's employees that were

premised on certain terms and terminology used by the employees of the defendants." (6/7/12 King Aff. at 2.) Mr. King declares that "[w]e, as plaintiffs, collectively paid over . . . $200,000 to the company that was retained by our attorneys at RubinBaum LLP for the e-mail search. After the search was completed, we were told by our attorneys that nothing of value was produced to help our case." (Id.) Mr. King concludes by stating that "[a]t no time was there ever any discussion about a second e-mail search with us by any of our attorneys especially since we had paid such an astronomical amount for the first search, which, according to our lawyers, had produced nothing to help us." (Id.)

> ### 4. Mr. Heslin's response to Mr. Rowe's claim that his former attorneys failed to provide itemized bills

By letter dated June 27, 2012, and received by the Court on July 9, 2012, Mr. Heslin responded to Mr. Rowe's June 5, 2012 and June 12, 2012 letters and specifically addressed Mr. Rowe's claims that the SNR attorneys misused funds and did not send Mr. Rowe itemized bills:

> During the course of the litigation, [Mr. Rowe] was provided periodically with detailed itemizations of the various disbursements incurred. In addition, all settlements prior to the disbursement of any funds were extensively negotiated by Mr. Rowe who generally objected to all major disbursements until he was provided with all backup documentation (and even then he negotiated discounts). Indeed, his misrepresentation is belied by the fact that, in his Response to the Court's Order dated June 5, 2012, he identifies precisely the name and address of the electronic discovery company as well as the cost of the process and how it was paid because he was provided with all such bills identifying the company. Nevertheless, he failed to produce them.

(Heslin Letter of July 9, 2012 at 3.)[28] Indeed, the only documents relating to attorneys fees and costs that Mr. Rowe has produced are a fax from RubinBaum dated May 14, 2002 and faxes

---

[28] Although the burden of proof is on the party seeking relief from the judgment, here, Mr. Rowe, the Court notes that none of the SNR attorneys supplemented their declarations with copies of the bills sent to Mr. Rowe, which might have clarified this issue. See Mendes Junior Intern. Co., 394 F. App'x. at 788. The Court also recognizes, however, that as Mr. Rowe himself notes, New York State Bar Rules only require attorneys to maintain billing

from SNR dated August 8, 2002,  December 20, 2002, February 14, 2003, and November 20,

2003 detailing how settlement payments from Monterey, Clear Channel/SFX, the Howard Rose

Agency will be distributed, as well as a fax from the Gary Firm, dated April 15, 2002 and titled

"Closing Statement – Client #40201," that provides an itemized list of costs advanced by the

Gary Firm, including $4,335.24 paid to Electronic Evidence Discovery.[29]  (Resp. to Heslin, Ex.

A.)  None of the documents support Mr. Rowe's claim that the SNR attorneys either hid or

destroyed the e-mail results reflected in Exhibit 31/Exhibit A from the first search conducted by

EED nor do the documents indicate that a second search was conducted.

### 5.  Analysis

Under Rule 60(d)(3), Mr. Rowe bears the "high burden" to prove by "clear and

convincing evidence" that the SNR attorneys engaged in misconduct and fraud that "deceived"

the Court and influenced its summary judgment decision.  See Anderson, 2012 WL 4513410, at

*4; Madonna, 878 F.2d at 65; Passlogix, Inc., 708 F. Supp. 2d at 396; Schiel, 2006 WL 2792885,

at *6.  Mr. Rowe relies solely on Exhibit 31/Exhibit A.  Exhibit 31/Exhibit A only demonstrates

that electronic discovery was conducted on the computer hard drives of Defendants and that a

print out was generated.  It does not alone constitute "clear and convincing evidence" that the

SNR attorneys actually possessed the e-mails underlying the report but concealed them from

Plaintiffs and the Court.  Indeed, as Mr. Heslin notes, Mr. Rowe has failed to submit any

evidence whatsoever that Defendants or EED ever provided the underlying e-mails to the SNR

---

documentation for seven years.  The record reflects that Plaintiffs contracted with and paid EED for its services
more than ten years ago.

[29] The Court notes that the document purporting to be the Gary Firm's itemized accounting of costs appears to be a
copy of only portions of the original document.  The "Closing Statement" appears to be in the form of an outline, yet
the section marked "Costs Advanced by the Law Firm" is labeled "b)" and there is no preceding section marked
"a)," nor is there a subsequent section marked "c)."

attorneys.  (See Heslin Letter of July 9, 2012 at 3.)  Accordingly, Mr. Rowe has failed to prove that Exhibit 31/Exhibit A is anything other than what Mr. Primoff recollected it to be without having access to the document: a preliminary statistical report "used to decide whether it was worthwhile for plaintiffs to pay . . . sums [of money] to initiate a second, and wider, search of defendants' email files . . . ."[30]  (Primoff Decl. ¶ 4.)  Given Mr. Rowe's failure to provide "clear and convincing evidence" to support his claim, the Court will not entertain his bald speculation that the SNR attorneys concealed or destroyed the e-mails forming the foundation for Exhibit A/Exhibit 31.

Moreover, the entire premise underlying this motion – that Mr. Rowe has somehow been denied access to the discovery produced by EED – is untrue.  Other than documents marked "attorneys eyes only" in accordance with Magistrate Judge Francis' protocol, (see discussion supra at 9-10), Mr. Rowe has always had the ability to access the very e-mails that he now alleges were concealed from him and destroyed.  Indeed, Mr. Rowe admits that EED conducted the e-mail discovery on the electronic mirror images of Defendants' computer hard drives, (see Pl.'s Resp. to 6/5/12 Ord. ¶ 1), which Mr. Rowe carefully reviewed, (see Rowe Aff. ¶¶ 9-10), and it is clear from the parties' submissions that the Gary Firm served as co-counsel during this time period and paid fees to EED, (see Primoff Decl. ¶ 5; Heslin Decl. ¶ 6; Resp. to Heslin, Ex. A).  If Mr. Rowe was concerned that his former attorneys had not provided his new attorneys with all of the relevant evidence in their possession, he could have asked the Gary Firm to

_____

[30] On this point, Mr. Heslin states "[a]ll files including the email discovery were provided to Mr. Gary's firm which if they contained the derogatory language Mr. Rowe claims, I assume Mr. Gary's firm would have used [them] in response to the defendants' summary judgment motion."  (Heslin Decl. ¶ 15.)  It is telling that Plaintiffs raised no alarm after receiving Ms. Frank's May 8, 2003 letter or her May 23, 2003 Declaration, (see discussion supra at n.12), and it is even more telling that Plaintiffs did not sound such concerns after the Court's summary judgment opinion, which explicitly discussed the evidentiary problem posed by Plaintiffs' failure to provide the e-mails underlying Exhibit 31, see Rowe, 2005 WL 22833 at *53 n.143.

acquire copies directly from EED of whatever reports or e-mails were sent to Mr. Rowe's former attorneys, including those marked attorneys'-eyes-only.

In fact, Mr. Rowe claims that he was suspicious when the SNR attorneys informed him that "nothing had been found as a result of the e-mail search." (Rowe Aff. ¶ 9.) He asserts that "I could tell that Mr. Gold, Mr. Primoff and Mr. Heslin were not being truthful but I had no 'proof' at that time," (id.), and that "I found it impossible to believe" that the e-mail search had not turned up any evidence of racial animus, (id. ¶ 10). Nevertheless, despite these suspicions, and despite the repeated requests by Defendants' counsel for copies of the e-mails underlying Exhibit 31 (see discussion supra at 14-15), Mr. Rowe has submitted no evidence that either he or the Gary Firm made any effort to contact EED and retrieve copies of the information provided to the SNR attorneys. The Court will not now reopen a more than seven year-old case based on nothing other than Mr. Rowe's suspicions that discovery was concealed from him when that allegation is so demonstrably false.

**E.     Mr. Rowe's Other Claim of Misconduct by the SNR Attorneys**

In addition to his claim that the SNR attorneys perpetrated a fraud upon the Court, Mr. Rowe also alleges that "the attorney client relationship [with his former attorneys] was [initially] formed after relentless solicitation by Attorneys Martin Gold and Christine LePera [sic]," which he claims violated "State Bar Rules and Ethical Considerations." (Resp. to Heslin ¶ 2(d).) This claim against attorneys Gold and Lepera is contradicted by the evidence. Indeed, the Court notes that Mr. Rowe's assertion is contradicted by his own acknowledgement, contained in the same response, that attorney Robert Donnelly introduced him to Mr. Gold and Ms. Lepera and described his claims to them. (Id. ¶ 4.) Moreover, Rule 60, only explicitly provides for relief from a judgment or order for "fraud (whether previously called intrinsic or extrinsic),

39

misrepresentation, or misconduct by <u>an opposing</u> party," Fed. R. Civ. P. 60(b)(3) (emphasis added), or for "fraud on the court," which may be committed by any party, Fed. R. Civ. P. 60(d)(3).  Even if Mr. Rowe had proven that Mr. Gold and Ms. Lepera engaged in overaggressive solicitation, this conduct would not rise to the level of fraud on the court and thus would not constitute grounds for the Court to overturn a final judgment under Rule 60.

The Court has addressed each of Mr. Rowe's arguments and has found that all but one of his claims has been filed outside the applicable statute of limitations.  More importantly, the Court has found that all of Mr. Rowe's arguments are meritless.  Accordingly, his motion to reopen the case pursuant to Rule 60 is denied.

## IV.    Request for Sanctions

Mr. Heslin has requested that Mr. Rowe be sanctioned for his unwarranted accusations against attorneys admitted to the bar of this Court.  This request must be considered in light of Mr. Rowe's conduct before this Court, the baseless allegations contained in his self-published book, his unwarranted complaints to the State bar authorities, and his unjustified letter to SNR's managing attorney.  (<u>See</u> discussion <u>supra</u> at 25-26.)

On June 9, 2012, this Court received an e-mail from Mr. Rowe with a letter attached that was dated June 4, 2012 and addressed to Jeffrey Klein, Esq. of Weil, Gotshal & Manges, LLP. The letter demanded the withdrawal of two affidavits that had been filed in the underlying litigation.  In denying his request, the Court informed Mr. Rowe that "[s]ince Plaintiff's motion under Rule 60 has not been granted, he has no standing at this time to further his cause or for discovery purposes."  (Order, ECF No. 778, June 12, 2012.)  The Court also warned Mr. Rowe that "during the pendency of this motion, any further actions of this type will be considered sanctionable."  (<u>Id.</u>)

Despite the Court's warning, on September 19, 2012, Mr. Rowe e-mailed papers to the Court that purport to be a motion to compel Mr. Rowe's former attorneys to "produce e-mail evidence that was fraudulently concealed from the Court in my case."  (Pl.'s Mot. to Compel ("Pl.'s Mot.") ¶ 1, Sept. 20, 2012.)  Given that this case remains closed due to the Court's 2005 judgment, Mr. Rowe must show the Court grounds to reopen the case before engaging in discovery.  His motion papers, however, failed to provide any such grounds.  His self-styled motion to compel is therefore inappropriately filed and will not be considered by the Court.

Rule 11 of the Federal Rules of Civil Procedure authorizes courts to order sanctions against a party who files spurious or vexatious actions.  See Fed. R. Civ. P. 11.  "A party who is found to have violated Rule 11 can be ordered by the court to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including reasonable attorney's fee[s].  The provisions of Rule 11 equally apply to pro se litigants."  Auen v. Sweeney, 190 F.R.D. 678 (N.D.N.Y.1986) (internal citation omitted) (emphasis in original).

Here, as detailed above, Mr. Rowe's Rule 60 motion accusing the SNR attorneys of has been filed without any basis for support.  Moreover, Mr. Rowe's self-styled motion to compel his former attorneys to produce documents was filed on September 19, 2012 in direct contradiction of the Court's June 12, 2012 warning.  Accordingly, the Court is inclined to agree with Mr. Heslin, who stated in his declaration that "[t]he Court should . . .  impose sanctions upon Mr. Rowe to once and for all end these spurious proceedings."  (Heslin Decl. ¶ 17.)  By November 21, 2012, Mr. Rowe is ordered to show cause, pursuant to Rule 11(c)(3), why sanctions should not be entered against him and to provide the Court with a certified financial statement of his assets and liabilities.  By the same date, the SNR attorneys are ordered to advise the Court, if

they are seeking damages, of any damages they have suffered as a result of Mr. Rowe bringing this action.

**V.      Conclusion**

For the reasons discussed herein, Mr. Rowe's Rule 60 motion is denied.

IT IS SO ORDERED.

Dated: New York, New York
      November 8, 2012

Robert P. Patterson, Jr.
U.S.D.J.

**Copies of this Opinion & Order were sent via mail to:**

*Plaintiff, proceeding pro se:*

**Leonard Rowe**
5805 State Bridge Road, Suite 350
Johns Creek, GA 30097

1006 Bay Tree Lane
Duluth, GA 30097
Ph: (404) 374-1370

**Copies of this Opinion & Order were sent via fax to:**

*Mr. Rowe's former attorneys:*

**Martin Roth Gold**
SNR Denton US LLP (NY)
1221 Avenue of the Americas
New York, NY 10020
Ph: (212)398-8701
Fax: (212)768-6800

**Raymond Heslin**
West End Financial Advisors LLC
333 East 66th Street
New York, NY 10065
Ph: (917) 941-4301
Fax: (212) 734-0986

**Christine Lepera**
Mitchell Silberberg & Knupp LLP (NY)
12 East 49th Street, 30th Floor
New York, NY 10017
Ph: (917) 546-7703
Fax: (917) 546-7673

**Richard Primoff**
Securities and Exchange Commission (NY)
3 World Financial Center, 4th Floor
New York, NY 10281
Ph: (212) 336-0148
Fax: (703) 813-9562